

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ATLAS SHIPPING AS,

                     Plaintiff,

   - against -

AEGIS COMPANY LTD. and,
NEW MILLENNIUM FINANCIAL SERVICES, LTD.

                     Defendants.
------------------------------------------------------------X

ECF Case

## VERIFIED COMPLAINT

Plaintiff, ATLAS SHIPPING AS (hereinafter "Atlas" or "Plaintiff"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendants, AEGIS COMPANY LTD., ("Aegis") and NEW MILLENNIUM FINANCIAL SERVICES LTD. ("NMFS") (hereinafter collectively "Defendants"), alleges, upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the breach of a maritime contract of charter. This matter also arises under the Court's federal question jurisdiction within the meaning of 28 United States § 1331.

    2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under foreign law.

    3.    Upon information and belief, Defendants were, and still are, foreign corporations, or other business entity organized and existing under foreign law with an office and place of business in Trinidad, West Indies.

    4.    At all times material to this action, Plaintiff was the disponent owner of the vessel M/V "PROGRESS" (hereinafter the "Vessel").

5. By a charter party contract dated June 8, 2007, (hereinafter the "Charter Party") Plaintiff voyage chartered the Vessel to Defendant Aegis, with Defendant NMFS as guarantor, for the carriage of a maximum quantity of 33,000 metric tons of aggregate and sand in bulk from the load port of Rojo, Dominican Republic, to the discharge port of Point Lisas, Trinidad or Chaguaramas, Trinidad, at a freight rate of $21.00 per metric ton. *A copy of the Fixture Note is attached hereto as Exhibit 1.*

6. Clause 20 of the Charter Party provided for demurrage to be payable by Defendants to Plaintiff at the rate of $37,000 per day, pro rata for any time incurred in loading and discharging the cargo in excess of the allowed laytime.

7. Plaintiff delivered the Vessel into the Defendants' service and at all times fully performed its duties and obligations under the Charter Party.

8. At the loadport Defendants incurred $8,861.25 of demurrage and at the discharge port an additional $801,517.50 of demurrage, no part of which has been paid.

9. In addition, Defendants ordered the Vessel to shift at the discharge port in Trinidad, incurring an additional $18,095.87 of shifting related costs, no part of which has been paid.

10. Defendants' failure to pay Plaintiff the outstanding amounts of demurrage and shifting costs constitutes a breach of the Charter Party contract.

11. Plaintiff has suffered damages as a result of the Defendants' breach of the charter party.

12. Pursuant to Clause 25 of the Charter Party, all disputes between the parties are to be submitted to arbitration in London with English Law to apply. Plaintiff will commence arbitration after the commencement of this action and jurisdiction is obtained over Defendants.

13. This action is brought to obtain jurisdiction over the Defendants and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

14. Interest, costs and attorneys' fees are routinely awarded to the prevailing party in proceedings subject to English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party.

15. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| | | |
|---|---|---:|
| a. | Principal Claim: | $ 821,198.94 |
| b. | Interest on principal claim for 3 years, compounded quarterly at 8 %: | $ 220,279.81 |
| c. | Estimated arbitration costs: | $ 35,000.00 |
| d. | Estimated recoverable legal fees and costs: | $ 200,000.00 |
| | Total: | $1,276,478.75 |

16. The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant(s) have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendants. *See Affidavit in Support of Prayer for Maritime Attachment annexed hereto as Exhibit "2"*.

17. The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States

Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendants held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendants, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.  That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Amended Verified Complaint

B.  That pursuant to 9 U.S.C. §§ 201. *et seq.* and/or the doctrine of comity this Court recognize and confirm any foreign judgment or arbitration award rendered on the claims had herein as a Judgment of this Court;

C.  That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all tangible or intangible property of the Defendants within the District, including but not limited to any funds held by any garnishee, which are due and owing to the Defendants, up to the amount $1,276,478.75 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Amended Complaint;

D.  That this Court enter Judgment against Defendants on the claims set forth herein;

E.  That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

F.  That this Court award Plaintiff its attorney's fees and costs of this action; and

G.  That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

Dated: July 21, 2008
      New York, NY

                    The Plaintiff,
                    ATLAS SHIPPING AS

By: _/s/ Anne C. LeVasseur_
    Patrick F. Lennon
    Anne C. LeVasseur
    LENNON, MURPHY & LENNON, LLC
    420 Lexington Ave., Suite 300
    New York, NY 10170
    (212) 490-6050 – phone
    (212) 490-6070 – fax
    pfl@lenmur.com
    acl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    City of New York.
County of New York   )

1. My name is Anne C. LeVasseur.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4. I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7. I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    July 21, 2008
          New York, NY

*Anne C. LeVasseur*
Anne C. LeVasseur

6

EXHIBIT 1

| | |
|---|---|
| 1. Shipbroker<br>FOURTRANS SHIPPING & CHARTERING INC<br>5830 NW 20TH PLACE<br>SUNRISE, FLORIDA 33313<br>TEL: 954-657-1253<br>FAX: 954-657-1269<br>EMAIL: fourtrans_ado@msn.com | Recommended The Baltic and International Maritime Council.<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 AND 1994)<br>(TO BE USED FOR TRADES FOR WHICH NO SPECIALLY APPROVED FORM IS IN FORCE)<br>CODE NAME: GENCON                     PART I |
| | 2. Place and date<br>SUNRISE, FLORIDA – JUNE 5, 2007 |
| 3. Owners/Place of business (Cl.1)<br>ATLAS SHIPPING A/S<br>SUNDKAJ 11<br>CPH FREEPORT<br>DK 2100 COPENHAGEN<br>DENMARK | 4. Charterers/Place of business (Cl.1)<br>NEW MILLENNIUM FINANCIAL SERVICES LIMITED ON BEHALF OF<br>(NEW MILLENNIUM FINANCIAL SERVICES TO REMAIN ULTIMATELY<br>RESPONSIBLE) AEGIS COMPANY LIMITED-ASSOCIATED COMPANY<br>#138 EASTERN MAIN ROAD TUNAPUNA<br>TRINIDAD, WEST INDIES<br>PHONE: 1-868-635-7221<br>FAX:1-868-645-4129<br>MOBILE: 1-868-384-3475 |
| 5. Vessel's Name (Cl.1)<br>MV PROGRESS | 6. GT/NT (Cl.1)<br>GT/NT: 24111/12019 |
| 7. DWT all told on summer load line in metric tons (abt.)(Cl.1)<br>41098 DWT | 8. Present position (Cl.1)<br>BALLASTING TOWARDS LOADPORT – DOM REP |
| 9. Expected ready to load (abt.)(Cl.1)<br>JUNE 15-16, 2007 | |
| 10. Loading port or place (Cl.1)<br>GO RIO, DOMINICAN REPUBLIC<br>ADD 1 SAFE PORT SAFE BERTH<br>ADD DRAFT 10.0 METERS (GUARANTEED BY CHARTERERS) | 11. Discharging port or place (Cl.1)<br>POINT LISAS 1 SAFE PORT SAFE BERTH<br>IN THE EVENT BERTH IS CONGESTED – CHARTRS TO<br>BE ALLOWED TO DISCHARGE AT CARI-DOCK, CHAGUARAMAS,<br>TRINIDAD – AAAA BENDS DRAFT 10.58 M (GNTEED BY CHARTRS) |
| 12. Cargo (also state quantity and margin in Owner's option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl.1)<br>AGGREGATE + SAND MAX QTY 33,000 MT<br>MASTER STOW PLAN / SEGREGATED ASF:<br>NO.1 / 5,050 MT SAND / FULL    (SF;ABT 1.43 MT = 1 CBM)<br>NO.2 / 7,138 MT STONES / FULL (3/4" SF;ABT 1.43 MT = 1 CBM) -<br>NO.3 / 7,285 MT SAND / FULL    (SF;ABT 1.43 MT = 1 CBM)<br>NO.4 / 8,000 MT STONES / SLACK(3/8" SF; ABT 1.45 MT = 1CBM)<br>NO.5 / 7,017 MT SAND / FULL    (SF;ABT 1.43 MT = 1 CBM) | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery)(Cl.4)<br>USD 21.00 PMT FIOT (SEE CL 35) | 14. Freight payment (state currency and method of payment; also beneficiary and bank account)(Cl.4)<br>FREIGHT PAYABLE IN USD (SEE CL. 22) |
| 15. State if vessel's cargo handling gear shall not be used(Cl.5)<br>CHARTRS TO HAVE FREE USE OF ALL VSLS GEARS & GRABS | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only)(Cl.6) |
| 17. Shippers / Place of business (Cl. 6)<br>ANCIND DOMINICANOS/IDEAL DOMINICANA<br>OFF. 1(809) 540 70 00 XT.2022<br>MOB. 1(809) 658 53 02 | a) Laytime for loading<br>10,000 MT PER WWD SHEX |
| 18. Agents (loading)(Cl.6)<br>SEE CL. 21 | b) Laytime for discharging<br>8,000 MT PER WWD SHINC |
| 19. Agents (discharging)(Cl.6)<br>SEE CL. 22 | c) Total laytime for loading and discharging<br>N/A |
| 20. Demurrage rate and manner payable (loading and discharging)(Cl.7)<br>USD 37,500 FDPR/FIO BOTH ENDS | 21. Cancelling date (Cl.9)<br>JUNE 17, 2007 – 00:00HRS |
| | 22. General Average to be adjusted at (Cl.12)<br>LONDON |
| 23. Freight Tax (state if for Owners' account) (Cl. 13 (c))<br>N/A | 24. Brokerage commission and to whom payable (Cl.15)<br>TTL COMMISSION 3.75 %<br>BREAKDOWN ASF:<br>1.25% for ANTARESNY<br>2.5% ADRS + FOURTRANS SHIPPING |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (If not filled in 19 (a) shall apply) (Cl.19)<br>ENGLISH LAW, LONDON | |
| b) State maximum amount for small claims/shortened arbitration (Cl.19)<br>N/A | 26. Additional clauses covering provisions, if agreed<br>CLAUSES 20-40 ARE FULLY INCORPORATED IN THIS CHARTER PARTY |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near thereto as she may safely get and lie always afloat, and there deliver the cargo.

2. Owners' Responsibility Clause
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. Deviation Clause
The vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. Payment of Freight
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.
(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost. Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid. (see box 13)
(c) On delivery. According to Box 13 freight or part thereof is payable at destination, it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.
Cash for vessel's ordinary disbursements at port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) percent to cover insurance and other expenses.

5. Loading / Discharging
(a) Costs/Risks
The cargo shall be brought into holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
(b) Cargo Handling Gear
Unless the vessel is gearless or unless it has been agreed between the parties that the vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of stevedores, time lost by breakdown of the vessel's cargo handling gear or motive power – pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party – shall not count as laytime or time on demurrage. On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.
(c) Stevedore Damage (see Cl. 23)
The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the vessel caused by stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the vessel's seaworthiness or class before the vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

6. Laytime
(a) Separate laytime for loading and discharging. The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and Holidays included, unless used, in which event time used shall count. The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and Holidays included, unless used, in which event time used shall count.
(b) Total laytime for loading and discharging.
The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and Holidays included, unless used, in which event time used shall count.
(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 13:00 hours, if notice of readiness is given up to and including 12:00 hours, and at 06:00 hours next working day if notice given during office hours after 12:00 hours. Notice of readiness at loading port to be given to the shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the vessel's arrival at or off the port of loading/discharging, the vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in port or not, whether in berth or not, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
If, after inspection, the vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the vessel is again ready to load/discharge shall not count as laytime.
Time used before commencement of laytime shall count. (see cl. 24)

Indicate alternative (a) or (b) as agreed, in box 16.

7. Demurrage
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the owners' invoice together with supporting data, SOF + NOR.
In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.
STAYS REMAINS

8. Lien Clause
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including recovering same. NE

9. Cancelling clause
(a) Should the vessel not be ready to load (whether in berth or not) on the cancelling date indicated in box 21, the Charterers shall have the option of cancelling this Charter Party.
(b) Should the owners anticipate that, despite the exercise of due diligence, the vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or
agree to a new cancelling date. Such option must be declared by the Charterers within 48 running hours after the receipt of the owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the owners' notification to the Charterers shall be the new cancelling date.
The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

10. Bills of Lading
Bills of Lading to be presented signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the owners' agents provided written authority has been given by owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the owners than those assumed by the owners under this charter party.

11. Both-to-Blame Collision Clause
If the vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the master, mariner, pilot or the servants of the owners in the navigation or in the management of the vessel, the owners of the cargo carried hereunder will indemnify the owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying vessel or the owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

12. General Average and New Jason Clause
General Average shall be adjusted in London unless otherwise agreed in box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the owners' servants (see clause 2).
If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the owners before delivery".

13. Taxes and Dues Clause
(a) On Vessel – The owners shall pay all dues, charges and taxes customarily levied on the vessel, howsoever the amount thereof may be assessed.
(b) On Cargo – The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.
(c) On Freight – Unless otherwise agreed in box 23, taxes levied on the freight shall be for the Charterers' account.

292  14. Agency
293       In every case the owners shall appoint their own agent both at the port of loading
294       and the port of discharge. (see cl. 20 + 21)

295  15. Brokerage
296       A brokerage commission at the rate stated in box 24 on the freight, deadfreight
297       and demurrage earned is due to the party mentioned in box 24.
298       In case of non-execution 1/3 of the brokerage or the estimated amount of freight
299       to be paid by the party responsible for such non-execution to the brokers as
300       indemnity for the latter's expenses and work. In case of more voyages the amount
301       of indemnity to be agreed.

302  16. General Strike Clause
303       (a)* There is a strike or lock-out affecting or preventing the actual loading of the
304       cargo, or any part of it, when the vessel is ready to proceed from her last port or at
305       any time during the voyage to the port or ports of loading or after her arrival there,
306       the master or the owners may ask the Charterers to declare, that they agree to
307       reckon the laydays as if there were no strike or lockout. Unless the Charterers
308       have given such declaration in writing (by telegram, if necessary) within 24 hours,
309       the owners shall have the option of cancelling this charter party. If part cargo has
310       already been loaded, the owners must proceed with same, (freight payable on
311       loaded quantity only) having liberty to complete with other cargo on the way for
312       their own account.
313       (b) If there is a strike or lock-out affecting or preventing the actual discharging of
314       the cargo on or after the vessel's arrival at or off port of discharge and same has
315       not been settled within 48 hours, the Charterers shall have the option of keeping
316       the vessel waiting until such strike/lockout is at an end against paying half
317       demurrage after expiration of time provided for discharging and lock-
318       out termination and thereafter full demurrage shall be payable until the completion
319       of discharging, or of ordering the vessel to a safe port where she can safely
320       discharge without risk of being detained by strike or lock-out. Such orders to be
321       given within 48 hours after the master or the owners have given notice to the
322       Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo
323       at such port, all the conditions of this charter party and of the Bill of Lading shall
324       apply and the vessel shall receive the same freight as if she had discharged at the
325       original port of destination, except that if the distance to the substituted port
326       exceeds 100 nautical miles, the freight on the cargo delivered at the substituted
327       port to be increased in proportion.
328       (c) Except for the obligations described above, neither the Charterers nor the
329       owners shall be responsible for the consequences of any strikes or lockouts
330       preventing or affecting the actual loading or discharging of the cargo.

331  17. War Risks ("Voywar 1993")
332       1) For the purpose of this clause, the words
333           The "Owners" shall include the shipowners, bareboat Charterers, disponent
334           owners, managers or other operators who are charged with the management of
335           the vessel, and the Master; and
336           "War Risks" shall include any war (whether actual or threatened), act of war,
337           civil war, hostilities, revolution, rebellion, civil commotion, warlike operations,
338           the laying of mines (whether actual or reported), acts of piracy, acts of
339           terrorists, acts of hostility or malicious damage, blockades (whether imposed
340           against all vessels or imposed selectively against vessels of certain flags or
341           ownership, or against certain cargoes or crews or otherwise howsoever), by
342           any person, body, terrorist or political group, or the Government of any state
343           whatsoever, which, in the reasonable judgement of the master and/or the
344           owners, may be dangerous or are likely to be or to become dangerous to the
345           vessel, her cargo, crew or other persons on board the vessel.
346       2) If at any time before the vessel commences loading, it appears that, in the
347           reasonable judgement of the master and/or the owners, performance of the
348           Contract of Carriage, or any part of it, may expose, or it is likely to expose, the
349           vessel, her cargo, crew or other persons on board the vessel to War Risks, the
350           owners may give notice to the Charterers cancelling this Contract of Carriage,
351           or may refuse to perform such part of it as may expose, or may be likely to
352           expose, the vessel, her cargo, crew or other persons on board the vessel to
353           War Risks; provided always that if this Contract of Carriage provides that
354           loading or discharging is to take place within a range of ports, and at the port or
355           ports nominated by the Charterers the vessel, her cargo, crew or other persons
356           onboard the vessel may be exposed, or may be likely to be exposed, to War
357           Risks, the owners shall first require the Charterers to nominate any other safe
358           port which lies within the range for loading or discharging, and may only cancel
359           this Contract of Carriage if the Charterers shall not have nominated such safe
360           port or ports within 48 hours of receipt of notice of such requirement.
361       3) The owners shall not be required to continue to load cargo for any voyage, or
362           to sign bills of Lading for any port or place, or to proceed or continue on any
363           voyage, or on any part thereof, or to proceed through any canal or waterway,
364           or to proceed to or remain at any port or place whatsoever, where it appears,
365           either after the loading of the cargo commences, or at any stage of the voyage
366           thereafter before the discharge of the cargo is completed, that, in the
367           reasonable judgement of the master and/or the owners, the vessel, her cargo
368           (or any part thereof), crew or other persons on board the vessel (or any one
369           more of them) may be, or are likely to be, exposed to War Risks. If it should so
370           appear, the owners may by notice request the Charterers to nominate a safe
371           port for the discharge of the cargo or any part thereof, and if within 48 hours of
372           receipt of such notice, the Charterers shall not have nominated such a port, the
373           owners may discharge the cargo at any safe port of their choice (including the
374           port of loading) in complete fulfilment of the Contract of Carriage. The owners
375           shall be entitled to recover from the Charterers the extra expenses of such
376           discharge and, if the discharge takes place at any port other than the loading
377           port, to receive the full freight as though the cargo had been carried to the
378           discharging port and if the extra distance exceeds 100 miles, to additional
379           freight
380           which shall be the same percentage of the freight contracted for as the
381           percentage which the extra distance represents to the distance of the normal
382           and customary route, the owners having a lien on the cargo for such expenses
383           and freight.
384       4) If at any stage of the voyage after the loading of the cargo commences, it
385           appears that, in the reasonable judgement of the master and/or the owners
386           vessel, her cargo, crew or other persons on board the vessel may be, or are
387           likely to be exposed to War Risks on any part of the route (including any canal
388           or waterway) which is normally and customarily used in a voyage of nature
389           contracted for, and there is another longer route to the discharging port, the
390           owners shall give notice to the Charterers that this route will be taken. In this
391           event the owners shall be entitled, if the total extra distance exceeds 100 miles,
392           to additional freight which shall be same percentage which the extra distance
393           represents to the distance of the normal and customary route.
394       5) The vessel shall have the liberty: -
395       a) to comply with all orders, directions, recommendations or advice as to
396           departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations,

307  discharge of cargo, delivery or in any way whatsoever which are given by the
308  Government of the Nation under whose flag the vessel sails, or other Government
309  to whose laws the owners are subject, or any other Government which so
310  requires, or by any body or group acting with the power to compel compliance with
311  their orders or directions;
312       (b) to comply with the orders, directions or recommendations of any war risks
313       underwriters who have the authority to give the same under the terms of the war
314       risks insurance;
315       (c) to comply with the terms of any resolution of the Security Council of the United
316       Nations, any directives of the European Community, the effective orders of any
317       other Supranational body which has the right to issue and give the same, and with
318       national laws aimed at enforcing the same to which the owners are subject, and to
319       obey the orders and directions of those who are charged with their enforcement;
320       (d) to discharge at any other port any cargo or part thereof which may render the
321       vessel liable to confiscation as a contraband carrier;
322       (e) to call at any other port to change the crew or any part thereof, or other
323       persons on board the vessel when there is reason to believe that they may be
324       subject to internment, imprisonment or other sanctions;
325       (f) where cargo has not been loaded or has been discharged by the owners under
326       any provisions of this clause, to load other cargo for the owners own benefit and
327       carry it to any other port or ports whatsoever, whether backwards or forwards or in
328       a contrary direction to the ordinary or customary route.
329       6) If in compliance with any of the provisions of sub-clauses (2) and (5) of this clause
330       anything is done or not done, such shall not be deemed to be a deviation, but
331       shall be considered as due fulfilment of the Contract of Carriage.

332  18. General Ice Clause
333       Port of Loading
334       (a) In the event of the loading port being inaccessible by reason of ice when the
335       vessel is ready to proceed from her last port or at any time during the voyage or
336       on the vessel's arrival or in case ice sets in after the vessel's arrival, the Master
337       for fear of being frozen in is at liberty to leave without cargo, and this Charter
338       Party shall be null and void.
339       (b) If during loading, Master, for fear of the vessel being frozen in, deems it
340       advisable to leave, he has the liberty to do so with what cargo he has on board
341       and to proceed to any other port or ports with option of completing cargo for the
342       owners benefit for any port or ports including port of discharge. Any part cargo
343       thus loaded under this Charter Party to be forwarded to destination of the vessel's
344       expense but against payment of freight, provided that no extra expenses be
345       thereby caused to the Charterers, freight being paid on quantity delivered (in
346       proportion if lumpsum), all other conditions as per this Charter Party.
347       In case of more than one loading port, and if one or more of the ports are
348       closed by ice, the master or the owners to be at liberty either to load the part
349       cargo at the open port and fill up elsewhere for their own account as under
350       section (b) or to declare the Charter Party null and void unless the Charterers
351       agree to load full cargo at the open port.

352       Port of Discharge
353       (a) Should ice prevent the vessel from reaching port of discharge the Charterers
354       shall have the option of keeping the vessel waiting until the re-opening of
355       navigation and paying demurrage or of ordering the vessel to a safe and
356       immediately accessible port where she can safely discharge without risk of
357       detention by ice. Such orders to be given within 48 hours
358       after the master or the owners have given notice to the Charterers of impossibility
359       of reaching port of destination.
360       (b) If during discharging, the master for fear of the vessel frozen in deems it
361       advisable to leave, he has liberty to do so with what cargo he has on
362       board and to proceed to the nearest accessible port where she can safely
363       discharge.
364       (c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall
365       apply and the vessel shall receive the same freight as if she had discharged at the
366       original port of destination, except that if the distance of the substituted port
367       exceeds 100 nautical miles, the freight on the cargo delivered at the substituted
368       port to be increased in proportion.

369  19. Law and arbitration
370       (a) This Charter Party shall be governed by and construed in accordance with
371       English law and any dispute arising out of this Charter Party shall be referred to
372       arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or
373       any statutory modification or re-enactment thereof for the time being in force.
374       Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed
375       by each party and the arbitrators so appointed shall appoint a third arbitrator, the
376       decision of the three-man tribunal thus constituted or any two of them, shall be
377       final. On the receipt by one party of the nomination in writing of the other party's
378       arbitrator, that party shall appoint their arbitrator within fourteen days, failing
379       which the decision of the single arbitrator appointed shall be final.
380       For disputes where the total amount claimed by either party does not exceed
381       the amount stated in box 25** the arbitration shall be conducted in accordance with
382       the Small Claims Procedure of the London Maritime Arbitrators Association.
383       (b) This Charter Party shall be governed by and construed in accordance with
384       Title 9 of the United States Code and the Maritime Law of the United States and
385       should any dispute arise out of this Charter Party, the matter in dispute shall be
386       referred to three persons at New York, one to be appointed by each of the parties
387       hereto, and the third by the two so chosen; their decision or that of any two of
388       them shall be final, and for purpose of enforcing any award, this agreement may
389       be made a rule of the Court. The proceedings shall be conducted in accordance
390       with the rules of the Society of Maritime Arbitrators, Inc.
391       For disputes where the total amount claimed by either party does not exceed the
392       amount stated in box 25** the arbitration shall be conducted in accordance with
393       the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc.
394       (c) Any dispute arising out of this Charter Party shall be referred to arbitration at
395       the place indicated in box 25, subject to the procedures applicable there. The
396       laws of the place indicated in box 25 shall govern this Charter Party.
397       (d) If Box 25 in Part I is not filled, sub-clause(a) of this Clause shall apply.

398       *(a), (b) and (c) are alternatives; indicate alternative agreed in box 25.

399       ** Where no figure is supplied in box 25 in Part I, this provision only shall
400       be void but the other provisions of this Clause shall have full force and
401       remain in effect.

RIDER TO C/P IS FULLY INCORPORATED IN THIS CHARTER PARTY AND MUTUALLY AGREED BETWEEN ATLAS SHIPPING A/S,( "SHIP-OWNER") DENMARK AND NEW MILLENNIUM FINANCIAL SERVICES LIMITED ON BEHALF OF AEGIS COMPANY LIMITED (CHARTERERS), TRINIDAD – C/P DATED JUNE 3, 2007

CL. 20 AGENTS AT LOADPORT:   KARSTEN P. WINDELER / MARITIMA DOMINICANA, S.A.
PHONE (809)539-5000
FAX (809)539-7200
HTTP://WWW.MARDOM.COM
SKYPE USERNAME <KPWINDELER>
GENERAL EMAIL ADDRESS IS: INFO@MARDOM.COM

CL. 21 AGENTS AT DISCHARGE PORT:   GULF SHIPPING LIMITED
LLOYD VOISIN BLDG.
12 CHARLES STREET,
PORT OF SPAIN
TRINIDAD
TEL: 868 623 4121 – 3
FAX: 868 623 4124
EMAIL: GULFSHIP@TSTT.NET.TT
SVOISINTOM@GULFSHIPPINGLTD.COM
SONJA VOISIN-TOM GENERAL MANAGER

CL. 22. OWNRRS BAN DETAILS:   DANSKE BANK A/S
HOLMENS KANAL AFDELING
HOLMENS KANAL 2-12
1090 COPENHAGEN K.
DENMARK
TELEX       : 27000
SWIFT ADD.  : DABADKKK
USD ACCOUNT NO. : 3001 356275
USD IBAN NO.   : DK41 3000 3001 356275
IN FAVOUR OF   : ATLAS SHIPPING A/S
VIA CORRESPONDING US BANK:
BANK OF AMERICA N.A.,
NEW YORK BRANCH
U.S.A.
SWIFT ADD.   : BOFAUS3N
IN FAVOUR OF : DANSKE BANK, COPENHAGEN
ACCOUNT NO.  : 6550253668

ATLAS SHIPPING A/S
SUNDKAJ 11
CPH FREEPORT
DK 2100 COPENHAGEN
DENMARK

CL. 23 STEVEDORE DAMAGE:   ALL CLAIMS FOR DAMAGE ALLEGEDLY CAUSED BY STEVEDORES TO BE SETTLED DIRECTLY BETWEEN THE OWNERS AND STEVEDORES AT LOADING AND DISCHARGING PORTS, SUCH DAMAGE, IF ANY, TO BE REPORTED IN WRITING BY THE MASTER WITHIN 24 HOURS AFTER OCCURRENCE, EXCEPT FOR HIDDEN DAMAGES OTHERWISE THE STEVEDORES ARE NOT LIABLE, CHARTERERS TO ASSIST OWNERS IN SETTLING CLAIM WITH STEVEDORES AND TO REMAIN ULTIMATELY RESPONSIBLE IN CASE OWNERS CANNOT OBTAIN STEVEDORES SETTLEMENT.

CL.24 COMMENCEMENT OF LAYTIME:   LAYTIME BENDS, NOR CAN BE TENDERED BY CABLE OR EMAIL IF NOR TENDERED BEFORE NOON LAYTIME WILL START AT AS PER GENCON WITH ADDITIONAL 6 HRS FREE TO CHARTRS BENDS EIU, LOADING/ DISCHARGING PORT WRITTEN NOTICE OF READINESS SHALL BE GIVEN 24 HOURS SHINC.

CL. 25 SUITABILITY OF BERTH/PORT:   ASIDE FROM DRAFT CONDITIONS – OWNERS TO SATISFY THEMSELVES AS TO VESSEL SUITABILITY

SUCH AS LOA, BEAM, PREVAILING AT LOAD AND DISCHARGE PORTS.

CL. 26 CLEANING OF HOLDS: VESSEL MUST ARRIVE TO LOAD PORT WITH HOLDS IN EVERY SENSE READY TO LOAD, FREE OF OTHER SUBSTANCES FROM PREVIOUS CARGOES, CLEAN, DRY AND SWEPT, TIME AND/ OR MONEY LOST FOR THIS REASON WILL BE FOR OWNERS ACCOUNT. CLEANING OF HOLDS AFTER COMPLETION OF DISCHARGE FOR OWNERS TIME AND ACCOUNT

CL. 27. CARGO LOADPLAN: MASTERS CARGO LOAD PLAN: SUBJ TO HARBOUR MASTER APPROVAL PRIOR TO LOADING. ADD 'BUT SAME NOT TO BE UNREASONABLY WITHHELD'

CL. 28.VESSELS ARRIVAL: VESSEL HAS TO ARRIVE IN GOOD TRIMMING FOR EASIER PRELOADING DRAFT SURVEY. ALSO HAS TO ARRIVE IN GOOD TRIMMING AT DISPORTS. THE CARGO TO BE LOADED AND STOWED/TRIMMED AND DISCHARGE UNDER THE MASTER'S SUPERVISION

CL. 29 PORT CHARGES: PORT CHARGES ARE INCLUDED IN FREIGHT RATES FOR ALL ROUTES. ALL TAXES, DUES OR FEES BEING ASSESSED ON THE VESSEL AND/OR HER AGENTS BY REASON OF THE CARRIAGE OF THIS CARGO, INCLUDING BUT NOT LIMITED TO WHARFAGE AND DOCKAGE, SHALL BE FOR OWNER'S ACCOUNT.

CL. 30. CRANE SPEED: MASTER CONFIRM VESSELS CYCLE SPEED BASIS 3 CRANES WORKING SIMULTANEOUSLY CAN ACCOMMODATE INTENDED DISCHARGING RATE OF 8000 MT PER WWD.

CL.31. RESPONSIBLE OF QUANTITY: VESSEL TO BE RESPONSIBLE FOR THE QUANTITY LOADED ACCORDING TO BILLS OF LADING QUANTITY AND BILLS OF LADING TO BE SIGNED BY THE MASTER ACCORDINGLY

CL.32. PORT DA'S: D/AS SENDS TO BE FOR OWNERS ACCOUNT. OWNERS TO PUT AGENTS IN FUNDS PRIOR TO VESSEL ARRIVAL AT BOTH LOADING AND UNLOADING PORTS, FAILING, CHRTRS ARE NOT TO BE RESPONSIBLE FOR ANY DELAYS TO VSL CAUSED BY OWNERS FAILURE TO PLACE AGENTS IN FUNDS TO VSL ARRIVAL

CL.33. OPENING+CLOSING OF HATCHES: 1ST OPENING AND LAST CLOSING OF HATCHES, TO BE EFFECTED BY CREW AT OWNERS EXPENSE, ALL OTHER OPENING AND CLOSING OF HATCHES TO BE FOR CHARTERERS' ACCOUNT THE MASTER IS ALSO TO ARRANGE TO HAVE THE HATCHES CLOSED WHEN THE WEATHER IS WET OR THREATENING

CL.34. VESSELS EQUIPMENT: LIGHTS, GEARS AND GRABS AS ON BOARD TO BE SUPPLIED FREE OF EXPENSE TO CHARTERERS. AT LOADPORT VSL CREW TO LEVEL CARGO WITH VSLS CRANES/GRABS AND SUCH TIME TO COUNT AS LOADING TIME. AT DISCHARGEPORT VSLS GEARS/GRABS TO BE AT CHARTRS DISPOSAL, FREE OF CHARGE, HOWEVER CRANE DRIVERS TO BE EMPLOYED AND PAID FOR BY CHARTRS AND AT CHARTRS RISK.

CL.35. LOI: DUE TO SHORT VOYAGE, CHARTERERS MAY REQUEST OWNERS STANDARD PANDI WORDING LOI FOR RELEASE OF CARGO WITHOUT PRESENTATION OF ORIGINAL BILLS OF LADING. CHARTERERS TO SIGN LOI ( BANK SIGNATURE IS NOT REQUESTED).

CL.36. LATE PAYMENT CLAUSE: IN CASE FREIGHT NOT IN TIME BEFORE BREAKING BULK, OWNERS MAY ANCHOR OUTSIDE THE PORT AREA AND ALLOWED TO TENDER NOR IMMEDIATELY AND TIME TO COUNT IN ACCORDANCE WITH LAYTIME CLAUSE. DETENTION RATE TO BE EQUAL AT THE DEMURRAGE RATE AT ALL TIME, NO EXTRA COSTS

WILL APPLY OR WILL BE CHARGED TO THE CHRS WHILE WAITING FREIGHT TO ARRIVE (AS ADDITIONAL PORT CHARGES OR TAXES ON THE VSL, ETC.). OWNERS WILL BE FULLY SATISFY WITH THE PAYMENT ONCE CHRS PRESENTED OFFICIAL WIRE TRANSFER CONFIRMATION (SWIFT) FROM THEIR BANK, AND OWNERS IMMEDIATELY WILL ALLOW THE DISCHARGE OF THE CARGO.

CL. 37. OVER TIME:    OVERTIME, IF ANY, TO BE FOR ACCOUNT OF THE PARTY ORDERING SAME, BUT OFFICERS' AND CREW'S OVERTIME ALWAYS TO BE FOR OWNER'S ACCOUNT.

CL.38. TENDER NOTICE:    OWNERS /MASTER TO GIVE NOTICE 3, 2 DAYS /24 HRS, OF READINESS TO LOAD TO CHARTERERS AND THE PORT AGENTS. OWNERS TO GIVE NOTICE OF ETA ON SAILINGS FROM LOADPORT FOLLOWED BY 24 HOURS DEFINITE NOTICE OF READINESS AND ARRIVAL TO THE DISCHARGE PORT AGENTS. UPON COMPLETION OF LOADING, THE OWNERS TO INFORM THE CHARTERERS OF THE TOTAL OF CARGO LOADED.

CL.39. FRT PAYMENT:    FREIGHT PAYMENT: THE FULL FREIGHT, LESS COMMISSION (3.75% COMM IAC AND INCL 1.25 TO ANTARESNY) IS PAYABLE 100% BEFORE BREAKING BULK. CONGEN BS/L MARKED "FREIGHT PAYABLE AS PER CHARTER PARTY DATED XXX2007" AND SHALL BE SIGNED BY THE MASTER OR THEIR AGENTS WHEN DULY AUTHORISED BY OWNERS/MASTER. IF CHARTERERS REQUEST "FREIGHT PREPAID" BILLS OF LADING SAME TO BE RELEASED UPON OWNERS BANKERS CONFIRMATION THAT FULL FREIGHT HAS BEEN IRREVOCABLY TRANSFERRED.
FULL FREIGHT DEEMED EARNED AFTER COMPLETION OF LOADING DISCOUNTLESS AND NON - RETURNABLE VSL AND/OR CARGO LOST OR NOT LOST.

CL.40. B/LANDING WEIGHT:    BILL OF LADING WEIGHT TO BE DETERMINED BY A JOINT DRAFT SURVEY, AT BOTH LOAD AND DISCHARGE PORTS. IF BILLS OF LADING AND SURVEY WEIGHT COMPATIBLE, VESSEL NOT TO BE RESPONSIBLE FOR ANY SHORTLANDING CLAIMS MADE BY WHOMSOEVER. MASTER TO REPRESENT OWNERS IN THE JOINT DRAFT SURVEYS

ATLAS SHIPPING A/S                    NEW MILLENNIUM FINANCIAL SERVICES
                                      LTD ON BEHALF OF AEGIS COMPANY LTD

EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
ATLAS SHIPPING AS,

                     Plaintiff,                      08 cv

  - against -                                    ECF Case

AEGIS COMPANY LTD. and,
NEW MILLENNIUM FINANCIAL SERVICES, LTD.

                     Defendants.
----------------------------------------------------------X

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut  )
                             ) ss: SOUTHPORT
County of Fairfield   )

     Anne C. LeVasseur, being duly sworn, deposes and says:

    1.    I am a member of the Bar of this Court and represent the Plaintiff herein. I am familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

### DEFENDANTS ARE NOT PRESENT IN THE DISTRICT

    2.    I have attempted to locate the Defendants, AEGIS COMPANY LTD. and NEW MILLENNIUM FINANCIAL SERVICES, LTD., within this District. As part of my investigation to locate the Defendants within this District, I checked the telephone company information directory, as well as the white and yellow pages for New York listed on the Internet or World Wide Web, and did not find any listing for the Defendants. Finally, I checked the New

York State Department of Corporations' online database which showed no listings or registration for the Defendants.

3. I submit based on the foregoing that the Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4. Upon information and belief, the Defendants have, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendants.

5. This is Plaintiff's first request for this relief made to any Court.

**PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER**

6. Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy R. Peterson, Coleen A. McEvoy, Anne C. LeVasseur or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendants.

7. Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendants.

8. To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

### PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

9. Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendants, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

### PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

10. Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served and throughout the next day, provided that process is served the next day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

Dated:   July 21, 2008
         Southport, CT

_____
Anne C. LeVasseur

Sworn and subscribed to before me
this 21st day of July, 2008.

_____
Notary Public

-4-